United States District Court
Southern District of Texas
**ENTERED**
June 09, 2023
Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| ELIZABETH CERDA, | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 3:21-cv-00214 |
| | § | |
| OLIN CORPORATION, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## <u>OPINION AND ORDER</u>

Pending before me are two competing motions: (1) a Motion for Summary Judgment (Dkt. 28) filed by Defendant Blue Cube Operations, LLC ("Blue Cube"); and (2) a Motion for Partial Summary Judgment (Dkt. 29) filed by Plaintiff Elizabeth Cerda ("Cerda"). Having reviewed the parties' briefing, the record, and the applicable law, I **GRANT** Blue Cube's Motion for Summary Judgment (Dkt. 28) and **DENY** Cerda's Motion for Partial Summary Judgment (Dkt. 29).

## BACKGROUND

Cerda originally instituted this employment action against Olin Corporation ("Olin") in Texas state court on July 14, 2021, alleging claims of sex discrimination, sexual harassment, and retaliation. On August 13, 2021, Olin removed the case to federal court on the basis of diversity jurisdiction. In doing so, Olin observed that its subsidiary, Blue Cube, was Cerda's employer, not Olin. On December 15, 2021, Cerda filed an Amended Complaint against only Blue Cube, asserting her original claims of sex discrimination, sexual harassment, and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), and adding claims of Family Medical Leave Act ("FMLA") interference or, in the alternative, FMLA discrimination and retaliation. Discovery has concluded. Blue Cube seeks summary judgment on all of Cerda's claims, while Cerda seeks summary judgment only on her FMLA-related claims.

Before analyzing the parties' competing motions, I will review the few undisputed facts in this case. Cerda worked as a Cell Services Operator at Blue Cube/Olin's facility in Freeport, Texas (the "Freeport Facility") from September 2006 until her employment was terminated on April 21, 2020.[1] In December 2016, Cerda took workers' compensation leave after sustaining an on-the-job injury to her foot. In August 2017, Cerda took FMLA leave while recovering from rotator cuff surgery. Cerda exhausted all 12 weeks of FMLA-protected leave on February 6, 2018. Ultimately, Cerda was out on leave for approximately 18 months, though Blue Cube allowed her to return to her employment in December 2018. In October 2018, while Cerda was still on leave, her team changed leadership and she began reporting to Steven Gibbons ("Gibbons"). The parties do not dispute that Cerda informed Gibbons about her father's health issues at some point in 2018, with Cerda telling Gibbons that she "was going to make more of an effort to go on [her] lunch break to see [her father] to make sure he had his medicines and something to eat . . . to hold him down until [she] got off work." Dkt. 30-1 at 8. It is also undisputed that at whatever time Cerda informed Gibbons about her father's health issues in 2018, Cerda was not yet eligible for FMLA leave—because she had exhausted her entitlement in February 2018—and did not become FMLA-eligible again until August 2019.

In January 2019, Cerda's mother died. Cerda's mother had been the primary caregiver for Cerda's father, who suffers from a variety of conditions that affect his ability to care for himself, including dementia. In early 2020, Gibbons told HR Manager Michelle Mulligan ("Mulligan") that other workers had complained about Cerda missing shifts. All operators receive a 30-minute unpaid lunch break every day. "Blue Cube automatically deducts the 30 minutes for lunch from the operators' time and therefore operators are not expected to clock out/in for lunch

---

[1] From September 2006 until late 2015, Cerda was an employee of Dow Chemical ("Dow"). Olin purchased the Freeport Facility from Dow in late 2015, which marked the start of Cerda's employment with Blue Cube.

unless they know they will exceed their 30 minutes." Dkt. 28 at 10. "On April 1, 2020, Mulligan pulled Cerda's gate logs and time punch records for the previous three months" and found "a pattern of Cerda missing from the facility for approximately one hour or more each day around lunchtime, during at least part of which time she was being paid." *Id.* at 11. Specifically, Cerda "was paid for 99 hours and 10 minutes that she did not work." Dkt. 28-17 at 5.

On March 17, 2020, during the timeframe that Mulligan was investigating Cerda's alleged time theft, Cerda called in sick to work, reporting a potential exposure to Covid-19. On March 19, 2020, Cerda returned to work and asked which time code to use for her two-day absence. Upon being told that she needed to use personal sick days, Cerda became upset. The exact language that Cerda used in the heat of the moment is disputed. What is not disputed, however, is that numerous witnesses submitted written statements to Mulligan suggesting that Cerda threatened to infect them if she became ill. *Compare* Dkt. 28-2 at 22 (Cerda testified during her deposition: "What I did say was like, you know what, next time I'm sick, I'm not even going to tell nobody *but my leader*." (emphasis added)), *with* Dkt. 28-13 at 2 ("She got angry and stated next time she would just come to work and get all these mother fuckers sick."), Dkt. 28-14 at 2 ("Next time I won't say shit, and hope all you motherf'ers get sick."), Dkt. 28-15 at 2 ("Next time I hope a [sic] get the coronavirus so I can give it to all you. I don't give a shit!"), *id.* at 3 ("[N]ext time I hope I really am sick and I'm going to come to work and I hope I get all of y'all sick."), *id.* at 4 ("She stated that she hopes that she gets the virus so she could give it to all of us."), *and id.* at 6 ("[Cerda] walked in frustrated about being sent home, then proceeded to say that she should've just came to work and didn't care if she got anyone else sick.").

On April 17, 2020, Mulligan convened an Employee Review Meeting with HR Director Greg Cunningham ("Cunningham"), Texas Operations Site Leader Kyle Shelton ("Shelton"), and the Director of Manufacturing for Cell Services Bert Fleck ("Fleck"). After reviewing Mulligan's investigation into Cerda's time theft

and threats, and Mulligan's recommendation that Cerda's employment be terminated, the group (Cunningham, Shelton, and Fleck) collectively decided to terminate Cerda's employment. Blue Cube officially terminated Cerda's employment on April 21, 2020.

Cerda does not dispute that she vented her frustration about missing work due to Covid-19 concerns to her coworkers, or that she was paid for time that she did not work. Rather, Cerda contends that she was terminated solely for time theft. Additionally, Cerda argues that the time she did not work "should have been FMLA protected." Dkt. 31 at 14. Under Cerda's theory, if her time was FMLA-protected, then it cannot have been time theft, which would make Blue Cube's reason for firing her pretextual. Even if Cerda's leave was not FMLA-protected, Cerda maintains that time theft is nevertheless pretext for sex discrimination because "literally 100% of males received zero punishment for extended lunches and 100% of females were terminated for same." Dkt. 31 at 24. Unrelated to her FMLA and sex discrimination claims, Cerda also alleges that she suffered sexual harassment and that her termination was retaliation for complaining of said harassment. I will address each of Cerda's claims in turn.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *See Rodriguez v. Webb Hosp. Corp.*, 234 F. Supp. 3d 834, 837 (S.D. Tex. 2017). The movant "bears the initial responsibility of informing the district court of the basis for its motion." *Brandon v. Sage Corp.*, 808 F.3d 266, 269–70 (5th Cir. 2015) (quotation omitted). To defeat a motion for summary judgment, the nonmovant must "present competent summary judgment evidence to support the essential elements of its claim." *Cephus v. Tex. Health & Hum. Servs. Comm'n*, 146 F. Supp. 3d 818, 826 (S.D. Tex. 2015). The nonmovant's "burden will not be satisfied by some metaphysical doubt

as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quotation omitted). Rather, the "nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim." *Brooks v. Houston Indep. Sch. Dist.*, 86 F. Supp. 3d 577, 584 (S.D. Tex. 2015). In ruling on a motion for summary judgment, I must construe "the evidence in the light most favorable to the nonmoving party and draw[] all reasonable inferences in that party's favor." *Darden v. Simplicity Fin. Mktg., Inc.*, No. 4:18-CV-1737, 2019 WL 6119485, at *1 (S.D. Tex. Nov. 18, 2019). "Cross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538–39 (5th Cir. 2004).

## ANALYSIS

### A.    CERDA'S FMLA INTERFERENCE CLAIM

Cerda alleges that she "was entitled to FMLA leave to care for her father" and that Blue Cube "interfered with Cerda's entitlement to FMLA leave." Dkt. 16 at 5. The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1). To establish a prima facie FMLA interference claim, Cerda must show that:

> (1) [s]he was an eligible employee; (2) h[er] employer was subject to FMLA requirements; (3) [s]he was entitled to leave; (4) [s]he gave proper notice of h[er] intention to take FMLA leave; and (5) h[er] employer denied h[er] the benefits to which [s]he was entitled under the FMLA.

*Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017). In its own motion for summary judgment, Blue Cube disputes only the fourth and fifth elements. In its response to Cerda's motion for partial summary judgment, however, Blue Cube

also disputes the first and third elements. I will address each disputed element of Cerda's FLMA interference claim in turn.

### 1.    Cerda Was Eligible for FMLA Leave (Element 1)

Employees are not eligible for FMLA leave until they have been employed "for at least 12 months by the employer with respect to whom leave is requested" and have worked "at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A). Cerda does not dispute that she only became eligible for FMLA leave again on August 7, 2019, having exhausted her previous entitlement in February 2018. Blue Cube does not dispute that Cerda was eligible for FMLA leave in 2020 during the time period in which Blue Cube alleges that Cerda committed time theft and for which Blue Cube ultimately terminated her employment. Accordingly, the parties do not actually dispute the first element: Cerda's FMLA eligibility.

What the parties disagree on is how Cerda's FMLA eligibility affects the fourth element: notice. Blue Cube argues that the fact "[t]hat [Cerda] made Gibbons aware of her father's health issues in 2018 . . . is irrelevant to her FMLA interference claim, as she was not eligible for FMLA leave at all at the time." Dkt. 30 at 11–12. Cerda counters that Gibbons was aware of her father's health issues "[f]rom at least 2018 until her termination in 2020," which put Blue Cube on notice of her need for FMLA leave. Dkt. 37 at 11; *see also* Dkt. 29 at 9 ("Cerda informed her supervisor that beginning at least as early as 2018 that her father had a serious health condition . . . . Thus, there can be no question that Cerda provided 'sufficient information' to inform [Blue Cube] that she was caring for her ailing father who was unable to perform normal daily activities and was incapacitated for weeks following his hemorrhage."). As I explain below, the fact that Cerda was not eligible for FMLA leave when she first told Gibbons about her father's health issues is irrelevant to whether Cerda gave proper notice of her intention to take FMLA leave because Cerda never requested or took leave of any kind—FMLA or otherwise.

### 2.   *Cerda Was Entitled to FMLA Leave (Element 3)*

The FMLA provides "a total of 12 workweeks of leave during any 12-month period . . . [i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). Blue Cube does not dispute that Cerda's father has a serious health condition. Rather, Blue Cube disputes whether Cerda's lunchtime visits to her father fall within the statutory meaning of "to care for." "There are no regulations specifically interpreting 29 U.S.C. § 2612(a)(1)(C). There is, however, a regulation interpreting a closely related provision concerning health-care provider certification." *Ballard v. Chicago Park Dist.*, 741 F.3d 838, 841 (7th Cir. 2014) (citing 29 U.S.C. § 2613(b)(4)(A), which describes what is required for a medical provider to certify that "the eligible employee is needed to care for" a family member "for purposes of leave under § 2612(a)(1)(C)"). That regulation provides:

> The medical certification provision that an employee is needed to care for a family member or covered servicemember encompasses both physical and psychological care. It includes situations where, for example, because of a serious health condition, the family member is unable to care for his or her own basic medical, hygienic, or nutritional needs or safety, or is unable to transport himself or herself to the doctor. The term also includes providing psychological comfort and reassurance which would be beneficial to a child, spouse or parent with a serious health condition who is receiving inpatient or home care.

29 C.F.R. § 825.124(a).

Blue Cube advances two arguments for why Cerda was not entitled to FMLA leave. First, Blue Cube argues that "the record evidence does not support that Cerda qualified for FMLA leave related to her father's serious health condition once she became eligible in August 2019, as Cerda testified her father could largely care for himself while she was still employed with Blue Cube." Dkt. 30 at 12. Second, Blue Cube argues that even "when [Cerda's] father did need some assistance, he had other caretakers during her employment, including her daughter, mother,

sisters, and a hired caregiver."[2] *Id.* The latter of these two arguments implicitly concedes that, regardless of whether Cerda's father could care for himself in 2018 or 2019, by the time Blue Cube terminated Cerda's employment in 2020 for time theft, Cerda's father did, in fact, need assistance. This concession, coupled with the fact that Blue Cube did not dispute Cerda's entitlement in its own motion for summary judgment, shows me that Blue Cube is not seriously disputing this element. Regardless, at a minimum, Cerda's testimony that she would take her father to his medical appointments and visit him on her lunch breaks to "mak[e] sure that he had something to eat" and to "take his medicine" and "to make sure that he wouldn't fall" creates a genuine fact issue as to whether Cerda's father suffered from a serious health condition that would have entitled Cerda to FMLA leave in 2020. Dkt. 30-1 at 9.

### 3.    *Cerda Did Not Give Proper Notice of Her Intention to Take FMLA Leave (Element 4)*

The FMLA regulations state that "[a]n employee must provide the employer at least 30 days advance notice before FMLA leave is to begin if the need for the leave is foreseeable." 29 C.F.R. § 825.302(a). "An employer may require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances." *Id.* § 825.302(d). "An employee also may be required by an employer's policy to contact a specific individual." *Id.* "Where an employee does not comply with the employer's usual notice and procedural requirements, and no unusual

---

[2] There are numerous problems with this argument. To start, it's utterly ridiculous for Blue Cube to suggest that Cerda's mother was an available caretaker once Cerda's father did need some assistance given that the record shows his condition worsened only after Cerda's mother died. I also find it quite problematic that Blue Cube just papers over the fact that two of Cerda's three sisters do not live anywhere near Freeport, Texas. One lives approximately 200 hundred miles away in Austin, Texas, and the other lives more than 1,000 miles away in Flagstaff, Arizona. Finally, Blue Cube cites to no law—and I am unaware that any law exists—suggesting that an employee is not entitled to FMLA leave simply because they have a support network.

circumstances justify the failure to comply, FMLA-protected leave may be delayed or denied." *Id.*

The Fifth Circuit has explained the notice requirement as follows:

> Although an employee need not use the phrase "FMLA leave," she must give notice that is sufficient to reasonably apprise her employer that her ***request to take time off*** could fall under the FMLA. This court does not apply categorical rules for the content of the notice; instead we focus on what is practicable based on the facts and circumstances of each individual. An employer may have a duty to inquire further if statements made by the employee warrant it, but the employer is not required to be clairvoyant.

*Lanier v. Univ. of Tex. Sw. Med. Ctr.*, 527 F. App'x. 312, 316 (5th Cir. 2013) (emphasis added) (cleaned up). I have emphasized the words "request to take time off" because that is the one thing that Cerda indisputably never did—request or take leave of any kind. Cerda's arguments revolve entirely around Blue Cube being on notice of her ***need*** for leave. It is true that Blue Cube is obligated to determine whether ***requested*** leave qualifies under the FMLA, *see* 29 C.F.R. § 825.302(c), but no employer has an obligation to offer an employee time away from work that the employee has not requested. Cerda's failure to request leave of any kind—personal, medical, FMLA, or otherwise—is fatal to her claim.

Cerda argues that "[Gibbons]'s declaration was unequivocal that [Blue Cube] had notice that Cerda needed time off to care for her ailing father." Dkt. 31 at 7 (citing 29-7 ¶¶ 4–5). But the fact that Gibbons knew "that Cerda would frequently visit [her father] during lunch and other times during work hours to care for him and that she was responsible for taking him to his doctor's appointments" (Dkt. 29-6 at 2) is not the same thing as Cerda requesting leave—again, leave of any kind, not just FMLA leave—to undertake these activities. Critically missing from Gibbons's declaration is any indication that Cerda ever asked Gibbons to take time off to care for her father. To the contrary, Cerda testified that she never asked Gibbons for FMLA leave to care for her father. *See* Dkt. 28-2 at 12. Cerda also readily admitted that she never asked Gibbons for

additional time over the lunch break to see her father. *See* Dkt. 36-1 at 7. Indeed, the most Cerda ever told Gibbons regarding her visits to her father was that she "was going to make more of an effort to go on [her] lunch break to see [her father] to make sure he had his medicines and something to eat . . . to hold him down until [she] got off work." Dkt. 30-1 at 8. But telling Gibbons that she was going to care for her father on her lunch break is a far cry from ***requesting time off work*** beyond her lunch break.

Cerda argues that "the federal regulations plainly put the burden on employers to provide employees with FMLA-related notices and information," which were not provided to Cerda. Dkt. 31 at 11 (quoting 29 C.F.R. § 825.300)). But the relevant text of those regulations betrays Cerda's argument, for the employer's obligation is triggered only "[w]hen an employee ***requests*** FMLA leave, or when the employer acquires knowledge that an employee's ***leave*** may be for an FMLA-qualifying reason." 29 C.F.R. § 825.300(b)(1) (emphasis added). The fact that Cerda repeatedly took time beyond her allotted 30-minute lunch break and accepted pay for that time that she did not work, coupled with her failure to muster any evidence suggesting that she asked Gibbons for leave of any kind (vacation, sick leave, etc.) to care for her father, is dispositive of this element and Cerda's FMLA interference claim. *See, e.g.*, *Lanier*, 527 F. App'x. at 317 (rejecting plaintiff's argument that her supervisor's knowledge of her father's poor health "was sufficient to apprise [plaintiff's supervisor] of her intent to request FMLA leave to care for her father").

Cerda makes much ado of Mulligan's testimony that an "**employee just has to __mention__** that they may have a serious health condition for themselves . . . [or] a parent . . . that meets the [] qualifications for FMLA leave" to put Blue Cube "on notice to follow up." Dkt. 37 at 15 (emphasis in original) (quoting Dkt. 29-4 at 71–72). Mulligan did say that, but Mulligan also testified that if an "employee has a family member that they need to provide some form of care for . . . ***they have to ask – or not – they need to request –*** make us aware

for their request or need for leave." Dkt. 29-4 at 91 (emphasis added). Accordingly, Cerda's argument that she also "raised her father's health to [Mulligan]" (Dkt. 29 at 3) is equally unavailing. "While [Cerda] did inform [Gibbons and Mulligan] of her father's serious diagnosis, she did not communicate that she needed time off to care for him." *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 827 (7th Cir. 2012) (affirming summary judgment for employer where plaintiff's conversations with her supervisor regarding her father's cancer "were too indefinite to put [the employer] on FMLA inquiry notice").

The bottom line is this: Cerda did not have to say that she wanted FMLA leave, but she did have to request time off work. Nothing in the record indicates that she ever made such a request to anyone at Blue Cube. Again—and really, I cannot stress this enough—Cerda never took leave ***of any kind*** to care for her father. She simply left at her lunch break, took longer than the time allotted, and never accounted for the time for which she was not working but was being paid. Against these facts, Cerda simply cannot establish that she provided proper notice of her intention to take FMLA leave as required to succeed on her FMLA interference claim.[3] Because Cerda cannot establish this necessary element, I must grant summary judgment to Blue Cube on Cerda's FMLA interference claim.

## B.   CERDA'S FMLA RETALIATION CLAIM

In addition to alleging interference with her FMLA rights, Cerda alleges that her termination was in retaliation "for issues that should have been protected as FMLA leave." Dkt. 16 at 5. "To make a prima facie case [of retaliation under the FMLA], [Cerda] must establish three elements: (1) she engaged in FMLA-protected activity, (2) [her employer] discharged her, and (3) a causal link between

---

[3] For this reason, I need not discuss the fifth element. Blue Cube cannot have denied Cerda leave that she never requested. Nor do I reach Cerda's argument that Blue Cube failed to comply "with the requirements of the stop-gap regulation, 29 C.F.R. § 825.301(d)." Dkt. 31 at 12. The stop-gap regulation also requires that an employee "state a qualifying reason for the needed leave and otherwise satisfy the notice requirements," 29 C.F.R. § 825.301(b), which Cerda categorically has not done.

the protected activity and the discharge." *Watkins v. Tregre*, 997 F.3d 275, 284 (5th Cir. 2021).

FMLA discrimination and retaliation claims follow the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Watkins*, 997 F.3d at 283–86 (applying the *McDonnell Douglas* burden-shifting framework to both Title VII and FMLA claims). Under that framework, the plaintiff must first establish her prima facie case of discrimination or retaliation. Then, the burden shifts to the employer "to proffer a legitimate, nondiscriminatory [or nonretaliatory] reason" for its adverse employment action. *Id.* at 281. If the employer proffers such a reason, "the presumption of discrimination [or retaliation] disappears, and [the plaintiff] must then produce substantial evidence indicating that the proffered . . . reason is a pretext for discrimination [or retaliation]." *Id.* at 282 (cleaned up). "The plaintiff must put forward evidence rebutting **each** of the nondiscriminatory [or nonretaliatory] reasons the employer articulates." *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001) (emphasis added).

"A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (quotation omitted). "[T]o establish disparate treatment a plaintiff must show that the employer gave preferential treatment to another employee under nearly identical circumstances; that is, that the misconduct for which the plaintiff was discharged was nearly identical to that engaged in by other employees." *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 514 (5th Cir. 2001) (cleaned up). "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." *Laxton*, 333 F.3d at 578.

### 1.  *Prima Facie Case: Cerda Did Not Engage in an FMLA-Protected Activity and Cannot Establish a Causal Link*

Having already found that Cerda did not provide proper notice of her intention to take FMLA leave, I cannot find that Cerda engaged in an FMLA-protected activity. *See Render v. FCA US, LLC*, 53 F.4th 905, 920 (6th Cir. 2022) ("It is the *request* that is protected activity."); *Abdulbaki v. Regent Care Ctr. of San Antonio II, Ltd. P'ship*, No. SA-11-CV-00211, 2012 WL 1076206, at *12 (W.D. Tex. Mar. 29, 2012) ("Plaintiff did not engage in a protected activity because he never actually applied for FMLA leave."); *Knox v. City of Monroe*, No. CIV. A. 07-606, 2009 WL 57111, at *7 (W.D. La. Jan. 8, 2009) (granting summary judgment to employer on plaintiff's FMLA retaliation claim where the plaintiff "did not request, attempt to request, or give notice of her intent to apply for FMLA leave any time prior to her termination"). Nevertheless, Cerda cites *Watkins* for the proposition that "apprising an employer of a parent's serious health condition—even if the employee does not specifically request 'FMLA leave'—constitutes protected activity under the FMLA." Dkt. 31 at 13. It is true that the plaintiff in *Watkins* did not specifically request FMLA leave, but she did give her bosses a "doctor's note stating that . . . she required three days off per week" and sent them "an email asking when her requested medical leave was supposed to start." 997 F.3d at 284. In stark contrast here, Cerda never requested any leave of any kind—personal, medical, FMLA, or otherwise. Cerda's failure to request time off work is fatal to both the first and third elements of her prima facie FMLA retaliation claim. Because Cerda did not engage in an FMLA-protected activity, she cannot establish a causal link between that nonexistent activity and her termination. Thus, Cerda cannot establish a prima facie case of FMLA retaliation.

But even if I assume that Cerda engaged in FMLA-protected activity and could make out a prima facie case, there is a separate and independent reason for granting summary judgment to Blue Cube on Cerda's FMLA retaliation claim:

Cerda has not produced substantial evidence that Blue Cube's legitimate, nonretaliatory reasons for terminating her employment are pretext.

### 2.   *Cerda Has Not Offered Substantial Evidence of Pretext*

Blue Cube argues that it discharged Cerda for two legitimate, nonretaliatory reasons: time theft and threatening her coworkers. Cerda does not dispute that time theft and threatening coworkers are legitimate, nonretaliatory reasons for discharging an employee. Rather, Cerda offers 11 reasons why Blue Cube's proffered reasons for terminating her are pretextual. *See* Dkt. 37 at 26–27. I will address each argument in turn.

**Reason (1): "the evidence shows that Mulligan was the [true] decisionmaker."** *Id.* at 26. As noted, Blue Cube maintains that three individuals (Cunningham, Shelton, and Fleck, collectively) made the decision to terminate Cerda. Cerda responds by arguing that she can establish pretext because Mulligan was actually the person who decided to terminate Cerda. This argument is based on nothing more than the fact that Mulligan is the one who processed Cerda's termination in Olin/Blue Cube's HR Central Data Management system. *See* Dkt. 31-7 at 2. Mulligan testified that she did not make the decision to terminate Cerda— she completes this form simply "to notify benefits and payroll that an employee has been separated so that they can then make sure that the employee is paid in a timely manner and sen[d] the COBRA notices that are necessary." Dkt. 29-4 at 128–29. The summary judgment evidence conclusively establishes that Cunningham, Shelton, and Fleck—not Mulligan—made the decision to terminate Cerda. *See* Dkt. 28-18 at 2; Dkt. 28-19 at 2; Dkt. 28-20 at 3. The fact that Mulligan processed Cerda's termination within an HR system is not substantial evidence of pretext.

**Reason (2): "Mulligan was the driving force of the termination."** Dkt. 37 at 26. In support of this argument, Cerda cites to her termination documentation and the fact that Mulligan recommended Cerda's termination at the Employee Review Meeting. Dkt. 31 at 15–16. But the driving force of Mulligan's

investigation was that *Gibbons* reported Cerda to Mulligan for suspected time theft. *See* Dkt. 28-3 at 5 ("Gibbons came to [Mulligan] to report that some of Cerda's coworkers had complained about Cerda disappearing from work during shifts, leaving her coworkers to perform her work."). Moreover, Cerda has failed to produce any evidence to suggest that Cunningham, Shelton, and Fleck did not make the decision to terminate Cerda's employment. But even if Mulligan was the driving force of Cerda's termination, I fail to see how that demonstrates that Blue Cube's stated reasons for terminating Cerda's employment are pretext. Cerda has not even attempted to articulate retaliatory animus or motive on Mulligan's part, as required to sustain a "cat's paw theory of liability." *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015).

**Reason (3): "Gibbons and Mulligan both claim that Cerda was terminated [only] for 'theft of time.'"** Dkt. 37 at 26. Cerda claims that two pieces of evidence support this argument. First, Cerda points to an isolated sentence in Gibbons's first declaration in which he states that "Cerda was terminated for theft of time in April 2020." Dkt. 29-6 at 2. This sentence is not substantial evidence of pretext because (1) Gibbons was not one of the individuals who made the decision to terminate Cerda; and (2) even if he were, stating that Cerda was terminated for theft of time is not mutually exclusive with Cunningham's, Shelton's, Fleck's, and Mulligan's statements that Cerda was also terminated for threats against her coworkers.

Second, Cerda points to Mulligan's deposition, in which Mulligan remarked that "[w]hat led to [Cerda's] termination was theft of time." Dkt. 29-4 at 117. Again, this statement is not mutually exclusive with having also terminated Cerda for threats against her coworkers. Moreover, reading this testimony in context shows that Cerda's counsel was questioning Mulligan about "issues with [Cerda's] gate logs," not anything having to do with the threats against Cerda's coworkers. *Id.* Substantial evidence is required to controvert the sworn affidavits stating that the "decision to terminate Ms. Cerda's employment was based entirely on [Mulligan's

investigation showing months of time-theft by Cerda and that she had threatened her coworkers." Dkt. 28-18 at 3; Dkt. 28-19 at 3 (same); *see also* Dkt. 28-20 at 3 ("Shelton, Fleck, and I then discussed Mulligan's findings and determined that Cerda's behavior violated several Olin/Blue Cube policies and warranted termination of her employment."). Cerda has not pointed to any evidence that would show Cunningham, Fleck, and Shelton terminated Cerda solely for theft of time and not also for making threats to her coworkers.

**Reason (4): "during the grievance hearing, only 'theft of time' was addressed."** Dkt. 37 at 26. Cerda argues that in a grievance proceeding she filed after her termination, "the lone reason for her termination [was] theft of time." Dkt. 31 at 18 (citing Dkt. 29-3 at 182). This argument is based on Cerda's testimony that "It was about my time is what I was terminated . . . because of taking longer lunches during company time." Dkt. 29-3 at 182. This argument is unavailing for many reasons. First, reading the testimony in context shows that the questioner expressly disclaimed asking about the grievance meeting. *See id.* at 181 ("I think you may be thinking about a grievance meeting later. I'm talking about the day that you were suspended."). Moreover, Cerda cut the questioner off as the questioner asked: "Was there any discussion in that meeting that you can recall about the reasons for termination, about, you know, ***other people taking long lunches*** or --" *Id.* at 182 (emphasis added). Two, Cerda testified that she discussed comments related to Covid-19 at that meeting. Dkt. 29-3 at 181; *see id.* at 182 ("The only thing I could think of is whenever I was talking to them and she was telling me that these people felt like I was – well I'm sorry if they think that, but that's not intentions. I would never hurt anybody in any way with COVID, you know. And that's what – I was trying to refer to that."). Finally, Cerda's testimony that she "was terminated . . . because of taking longer lunches during company time," *id.*, is not mutually exclusive of her also being terminated for threats against her coworkers. It certainly is not substantial evidence that the affidavits of Cunningham, Fleck, and Shelton are pretextual.

**Reason (5): "Mulligan 'conducts sham investigations to support predetermined conclusions.'"** Dkt. 37 at 26. This statement comes from Gibbons's second declaration. The full paragraph reads:

> I am familiar with Mulligan conducting workplace investigations. In my experience, Mulligan starts her investigation with a conclusion and then attempts to build an investigative file that supports her already-made conclusion. She then asks interviewees leading questions to obtain answers she desires. Based on my experience as a supervisor and participating in numerous workplace investigations, such investigations must be performed carefully so as to not inform the interviewee about the nature of the information sought to the extent possible.

Dkt. 31-1 at 1. This statement, even if true, is irrelevant, because it has no connection to Mulligan's investigation of Cerda's time theft or threats against her coworkers. Gibbons does not state that Mulligan's investigation of Cerda's time theft—an investigation that was initiated based on *his* report to Mulligan—was a sham, or that the numerous witness affidavits that Mulligan gathered regarding Cerda's threats against her coworkers were fabricated. This statement is not relevant, and it certainly is not substantial evidence that the affidavits of Cunningham, Fleck, and Shelton are pretextual.

**Reason (6): "[Blue Cube] spoliated important evidence."** Dkt. 37 at 26. This is a very serious allegation that, if Cerda's counsel actually believed it to be true, should form the basis of a motion for sanctions. A review of the record, however, shows that this allegation is entirely baseless. Cerda argues that she "was informed that if they pulled everyone's 'gate logs,' the entire Texas Cell Services group would be terminated." Dkt. 31 at 19. This argument is based on a portion of Cerda's own deposition testimony. This testimony is inadmissible hearsay. Cerda is repeating something said to her by Charles Singletary ("Singletary"), who was the "main guy from the union department, from Union 564." Dkt. 29-3 at 122. Singletary was not a Blue Cube employee. *See id.* Accordingly, his statements are not the statement of a party opponent and are thus inadmissible hearsay. But even if this statement were admissible, it is irrelevant because Singletary was not

speaking as a Blue Cube employee or as a legal representative of Blue Cube responding to Cerda's discovery requests. Accordingly, this baseless allegation does not establish pretext.

**Reason (7): "[Blue Cube] violated its own retention policies."** Dkt. 37 at 26. Cerda argues "that the 'gate logs' were not preserved by [Blue Cube]" even though "[Blue Cube]'s own policy states that the 'gate logs' should have been retained for eight (8) years." Dkt. 31 at 20. This is, again, an entirely baseless argument as it overlooks Mulligan's affidavit, which states:

> Although Olin purchased the plants from Dow in 2015, Dow still owns the land and the overall worksite. Dow controls access to and from the worksite using manned security gates at the front entrance that Blue Cube employees are required to drive through and swipe their badge. ***The gate logs that are created reflecting the dates and times of entry and exit belong to Dow and do not belong to Blue Cube or Olin.*** If Blue Cube wishes to see the logs for a particular individual, we have to request them and pay Dow a nearly $3,000 fee for someone at Dow to compile the logs. Additionally, my understanding is that ***the logs only go back three months***, so we are limited in what we can receive in response to our request.

Dkt. 28-3 at 5 (emphasis added). Accordingly, it would be patently ***unreasonable*** for a jury to "infer that [Blue Cube] intentionally destroyed the records as part of a cover-up," Dkt. 31 at 20, because Blue Cube indisputably does not control the records in question. This argument does not move the pretext needle at all.

**Reason (8): "there were approximately 223 times that employees other than Cerda took longer than thirty-minute lunches."** Dkt. 37 at 26. In support, Cerda attaches to her response a

> subset of data [that] consists of "gate logs" for sixteen (16) employees who were members of the Texas Cell Services group and is limited in time to the months leading up to Cerda's termination and part of 2022, when [Blue Cube] changed its practice of allowing one-hour lunches to a strict practice of only thirty-minute lunches.

Dkt. 31 at 21. Cerda argues that in this subset, "there were approximately 223 times that employees other than Cerda took lunches that were longer than thirty (30)

minutes." *Id*. Cerda makes this argument in an attempt to establish disparate treatment, which is one way to establish that Blue Cube's proffered reasons for terminating Cerda are pretext. To establish disparate treatment, Cerda must show that these employees are "nearly identical" to her. *Okoye*, 245 F.3d at 514 (collecting cases).

Cerda contends that all 16 of these employees reported to Gibbons, were subject to the same lunch policy as Cerda, and worked the same shift as Cerda, yet none of these employees adjusted their time after taking longer than a 30-minute lunch break. I will assume this is true,[4] but it does not establish that these employees were similarly situated to Cerda. First, Cerda does not state whether any of these employees also made threats against their coworkers. *See id*. ("[T]o establish disparate treatment a plaintiff must show that the employer gave preferential treatment to another employee under nearly identical circumstances; that is, that the misconduct for which the plaintiff was discharged was nearly identical to that engaged in by other employees." (cleaned up)).

Second, in "64 days of time data collected," Cerda "was paid for 99 hours and 10 minutes that she did not work." Dkt. 28-17 at 5–6. But Cerda tellingly does not include her own gate logs in the subset of data that she attaches to her response. Nor does she offer an analysis of how much time each of these 16 employees allegedly stole. Thus, there is no way to compare Cerda's undisputed time theft of more than two weeks' worth of work with the alleged time theft of these other workers. For example, did these other employees steal anything close to 99 hours and 10 minutes of time, or were they all a few minutes late every now and again, such that their total stolen time was de minimis? Without this information, there is no way to know whether any of these employees are suitable comparators.

**Reason (9): "no one else was disciplined or fired for long lunches despite the 223 times that other employees did so."** Dkt. 37 at 26. I will

---

[4] I will also overlook the fact that time entries from 2022—more than a year after Cerda was terminated—are entirely irrelevant to this lawsuit.

assume, *arguendo*, that this statement is true, but for all the reasons stated above, it does not suggest pretext. Without more information, there is simply no way of knowing whether any of these other employees are fair comparators to Cerda. Remember, at this stage, it is *Cerda* who bears the burden to come forward with *substantial evidence* showing that the legitimate, nonretaliatory reasons for terminating her employment are pretext. *See Watkins*, 997 F.3d at 282.

**Reason (10): "since the gate logs have been produced, [Blue Cube] still has not disciplined any of those employees, because it is not a real policy violation."** Dkt. 37 at 26–27. Again, I will assume, *arguendo*, that this is a true statement, but absent evidence showing that these employees are nearly identically situated to Cerda, it simply does not matter.

**Reason (11): "the temporal proximity is a matter of days."** *Id.* at 27. This argument appears to relate to this assertion from Cerda's response to Blue Cube's motion for summary judgment: "given the short two-week gap between her termination and her complaints of sexual harassment, causation is satisfied by temporal proximity alone." Dkt. 31 at 25. But Cerda must establish "a causal link between the [FMLA] protected activity and the discharge." *Watkins*, 997 F.3d at 284. Complaining of sexual harassment is not an FMLA-protected activity. Thus, the fact that Cerda complained of sexual harassment days before being terminated for time theft and making threats to her coworkers bears no relation whatsoever to Cerda's *FMLA* retaliation claim.[5]

Cerda makes one final attempt at demonstrating pretext, arguing that "[n]one of the declarations of the alleged 'decisionmakers' indicate that the supposed COVID threats alone were sufficient for Cerda's termination," meaning

---

[5] Even if Cerda's complaint of sexual harassment had some bearing on her FMLA retaliation claim, temporal proximity between termination and protected activity is sufficient only for a *prima facie* case, as the cases that Cerda cites acknowledge. *See* Dkt. 31 at 25–26 (collecting cases). But we are at the point in the burden-shifting framework where it has come back to Cerda to proffer "substantial evidence" that Blue Cube's reasons are pretext. Temporal proximity does not get Cerda over that hump.

that "the two purported reasons were not *independently* sufficient for termination." Dkt. 37 at 27 (emphasis in original). I appreciate the creativity of this argument, but there is tellingly no case law cited in support. More importantly, this argument rests upon the assumption that "Cerda has dismantled the theft of time reason." *Id.* at 28. Because Cerda has not provided a nearly identical comparator, she has not dispensed with the theft of time reason. So, it matters not whether theft of time and making threats against coworkers are independent and sufficient reasons for terminating Cerda's employment. Cerda cannot establish that Blue Cube's proffered legitimate, nonretaliatory reasons for terminating her employment—time theft and threats to her coworkers—are pretext.[6] Accordingly, I must award summary judgment to Blue Cube on Cerda's FMLA retaliation claim.

## C.   CERDA'S TITLE VII SEX DISCRIMINATION AND RETALIATION CLAIMS

Cerda also brings claims of sex discrimination and retaliation under Title VII. I assume, *arguendo*, that Cerda can prove a prima facie sex discrimination claim because she was the only female terminated for taking long lunches, whereas men who took long lunches were not terminated. I also assume, *arguendo*, that Cerda can prove a prima facie retaliation claim because she complained about sexual harassment and was terminated shortly thereafter. Nevertheless, Cerda's sex discrimination and retaliation claims necessarily fail for the same reason as her FMLA retaliation claim: Cerda does not have substantial evidence that Blue Cube's legitimate, nonretaliatory reasons for terminating her employment—time theft and making threats to her coworkers—are pretext. Accordingly, I must award summary judgment to Blue Cube on these claims as well.

---

[6] I have not reached Cerda's argument regarding the "mixed-motive" standard for FMLA retaliation claims because that standard applies only "when there is evidence that both legitimate and illegitimate motives played a role in the challenged employment action." *Stanton v. Jarvis Christian Coll.*, No. 20-40581, 2022 WL 738617, at *7 (5th Cir. Mar. 11, 2022). Here, both of Blue Cube's proffered reasons are legitimate and Cerda has not shown otherwise.

### D.   CERDA'S TITLE VII SEXUAL HARASSMENT CLAIM

Cerda claims that Blue Cube subjected her "to a sexually harassing hostile work environment." Dkt. 16 at 4. Cerda must prove five elements to prevail on her hostile work environment claim:

> (1) that [she] belongs to a protected class; (2) that [she] was subject to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment affected a "term, condition, or privilege" of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt remedial action.

*Shepherd v. Comptroller of Pub. Accts. of State of Tex.*, 168 F.3d 871, 873 (5th Cir. 1999). Blue Cube concedes the first and second elements. In contesting Cerda's sexual harassment claim, Blue Cube bulletizes all nine possible instances of harassment that Cerda mentioned in her deposition testimony. *See* Dkt. 28 at 28–29. Importantly, Blue Cube highlights Cerda's testimony that she did not report eight of these nine incidents. *See id.* In her response, Cerda focuses exclusively on the one instance that she did report; she does not contest her failure to notify Blue Cube of the eight other incidents, nor does she argue that Blue Cube had constructive notice of these eight unreported incidents. Accordingly, the only allegation of harassment properly before me is the one that Cerda reported.[7]

In her response, Cerda argues that in the two weeks leading up to her termination, she was constantly "harassed by co-workers about a newly hired employee named 'Cristi,' who was supposedly homosexual." Dkt. 31 at 24. Cerda testified that her coworkers would say: "Oh look, she's hitting on you. She is going to try to hit on you in the bathroom," and "[S]he is looking at you. She . . . started checking you out and . . . oh, wait until you go to the restroom, the ladies room,

---

[7] Rule 56(e)(2) provides: "If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Blue Cube argues that it "was *not* on notice of Cerda's alleged sexual harassment concerns." Dkt. 28 at 30. Cerda does not contest this fact for any instance of alleged harassment, save for the comments concerning a female coworker named Cristi. Accordingly, I consider it undisputed that Blue Cube did not know, nor should it have known, of the eight instances of harassment for which Cerda testified that she did not notify anyone.

and stuff like . . . that." Dkt. 29-3 at 24–25. Blue Cube acknowledges that Cerda testified that she "reported this teasing to the technical advisors and to Gibbons." Dkt. 28 at 28. Because Blue Cube concedes the first two elements of a sexual harassment claim; because this harassment was clearly based on sex, given that Cerda, the only other female, was the only employee subject to this teasing;[8] and because Cerda indisputably reported this harassment to Blue Cube, the only issue for me to resolve is whether this harassment was sufficiently severe or pervasive to alter the terms or conditions of Cerda's employment.

"For conduct to be sufficiently severe or pervasive, it must be both objectively and subjectively offensive." *Bye v. MGM Resorts Int'l, Inc.*, 49 F.4th 918, 924 (5th Cir. 2022). In determining whether the alleged harassment was objectively offensive, a district court must "consider the totality of the circumstances, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes with an employee's work performance." *Badgerow v. REJ Props., Inc.*, 974 F.3d 610, 618 (5th Cir. 2020) (quotation omitted). Here, every factor but the first weighs against Cerda.

Cerda testified that her coworkers would harass her about Christi "about every day . . . whenever they got a chance." Dkt. 29-3 at 28. This is certainly frequent. Yet, Cerda's response focuses exclusively on the frequency of the conduct and the fact that she reported it. Cerda does not point to any evidence showing— indeed, Cerda does not even argue—that this conduct was severe, physically threatening or humiliating, or that it interfered with Cerda's work performance. To be clear, these types of comments are certainly offensive. But that is all they are. Because Cerda cannot establish that these comments about Christi were sufficiently severe or pervasive, I must grant summary judgment to Blue Cube on

---

[8] "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (quotation omitted).

Cerda's hostile work environment claim. *See, e.g.*, *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005) ("For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986))); *Shepherd*, 168 F.3d at 874 (collecting cases and holding that comments about the plaintiff's nipples and thighs, though "boorish and offensive," did not physically threaten the plaintiff, unreasonably interfere with her work performance, or "undermine [her] workplace competence," and thus did not affect a term of her employment).

## CONCLUSION

For all the reasons stated above, Blue Cube's motion for summary judgment (Dkt. 28) is **GRANTED**, and Cerda's motion for partial summary judgment (Dkt. 29) is **DENIED**. I will enter a final judgment separately.

SIGNED this 9th day of June 2023.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE